**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**JAHBAREE J. ACHEE,**

                                   **Plaintiff,**                              **OPINION & ORDER**

**-against-**                                                                  **20-cv-5294 (NG) (LGD)**

**INCORPORATED VILLAGE OF VALLEY
STREAM, VILLAGE OF VALLEY
STREAM PARKS AND RECREATION
DEPARTMENT, FRANK TORRES, AND
LORRAINE WERBECK,**

                                   **Defendants.**

-------------------------------------------------------- x

**GERSHON, United States District Judge:**

Plaintiff Jahbaree Achee sues the Incorporated Village of Valley Stream, the Village of

Valley Stream Parks and Recreation Department, Frank Torres, and Lorraine Werbeck

("Defendants") for hostile work environment, retaliation, and discrimination in violation of Title

VII; 42 U.S.C. § 1981; and the New York State Human Rights Law ("NYSHRL"), New York

Executive Law §§ 296, et seq. Defendants seek summary judgment on all claims. For the reasons

set forth below, Defendants' motion is denied in its entirety.

**I.      Facts**

The record reveals numerous areas of dispute which are identified below.

   **A.  Mr. Achee's Employment and the Discriminatory Statements He Experienced**

Mr. Jahbaree Achee identifies as a Jewish African American male. In June of 2014, Mr.

Achee began working for the Village of Valley Stream (the "Village") as a seasonal laborer in the

Parks Department. Throughout his employment with the Village, Mr. Achee had two supervisors,

Frank Torres and Lorraine Werbeck. As part of their duties as supervisors, Mr. Torres and Ms.

Werbeck would assign crews of workers to Parks Department projects and would periodically visit job sites to monitor their progress.  It is undisputed that, as supervisors, Mr. Torres and Ms. Werbeck had input into employee discipline, though they did not have the ultimate authority to terminate employees.[1]

### 1.  Statements by Coworker Ronald Rivosecchi

On Mr. Achee's first day of work, one of his coworkers informed Mr. Achee that another coworker, Ronald Rivosecchi, had called Mr. Achee a "n****r." Achee Dec. ¶9.[2]  In a separate incident approximately two weeks later, Mr. Rivosecchi approached Mr. Achee and "yelled multiple racial slurs at [him], including 'stinking n****r.'" *Id*. ¶12.  After this incident, Mr. Rivosecchi continued to make racially discriminatory comments, telling Mr. Achee that "n****rs cannot perform the job" and questioning him about why he was working for Valley Stream.  *Id*. ¶15.

On September 26, 2014, Mr. Achee wrote a letter to the Village requesting to change roles from a seasonal to a part-time worker.  Mr. Achee wrote that he "would love to stay and work[s] well with others."  In another letter Mr. Achee sent to the Village in July of 2015, Mr. Achee wrote that he had learned "so much about parks from [his] supervisors" Ms. Werbeck and Mr. Torres and reiterated his request to transition to a part-time worker.  This request was ultimately granted.

---

[1] Mr. Achee argues that Peter Savellichi, his crew chief, was also his supervisor, but Plaintiff has not adduced sufficient evidence to show that Mr. Savellichi had the required authority to "effect a significant change in employment status" to be considered a supervisor.  *See Vance v. Ball State University*, 570 U.S. 421, 431 (2013).  Indeed, the Supreme Court has held that "[t]he ability to direct another employee's tasks is simply not sufficient" to make one a supervisor.  *Id.* at 439.

[2] The record includes both deposition testimony of Mr. Achee and a later Declaration.  Because Defendants have not put forth any reason that Mr. Achee's Declaration should be disregarded, I will consider both on this motion.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("a material issue of fact may be revealed by [an opposing party's] subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony.").

Mr. Achee states that, after his transition to a part-time worker, Mr. Rivosecchi continued to make racially charged statements to him.  Mr. Achee further states that, in 2016, these comments escalated to threats against Mr. Achee and that Mr. Rivosecchi said "Hang that n****r in the creek bed" in reference to Mr. Achee in front of other coworkers.  Achee Dec. ¶16.  In total, Mr. Achee estimates that Mr. Rivosecchi used the word "n****r" more than ten times over the course of the five years that Mr. Achee was employed by the Parks Department.  *Id*. ¶17.

### 2.  Statements by Coworker Robert Inzerillo

Mr. Achee also states that his coworkers made antisemitic remarks to him.  Specifically, Mr. Achee states in his Declaration that a coworker named Robert Inzerillo told him in 2016 that "black jews don't matter, blue lives matter" and also made "derogatory comments" about his faith. *Id*. ¶19.  Mr. Achee also states that members of his crew knew of his Jewish faith and would make "numerous hateful and humiliating Anti-Jewish comments and jokes" towards him.  *Id*. ¶20. Though Mr. Achee asserts that knowledge of his Jewish faith was well-known among his coworkers and supervisors, several Village employees, including Mr. Achee's Human Resources Director Alison Walsh, who also identifies as Jewish, and the Village Clerk James Hunter denied learning that Mr. Achee was Jewish until the filing of the Complaint in this matter.

### 3.  Statements by Coworker Frank Caracciolo

In the summer of 2018, Mr. Achee states, another coworker named Frank Caracciolo made discriminatory statements towards him: Caracciolo showed Mr. Achee a picture of a noose on his phone, told him that "white people stick together" and stated that his "co-workers were going to hang" Mr. Achee.  *Id*. ¶21.  Mr. Achee states that, after this incident, his coworkers began regularly making comments that they would hang him.  *Id*. ¶23.  The following year, in the summer of 2019,

according to Mr. Achee, Caracciolo again showed him a noose on his phone and told him that "white employees 'hang n***as in the creek bed.'" *Id*. ¶24.

The extent to which Mr. Achee was upset by these comments is disputed. At Mr. Achee's deposition, he initially stated that he didn't "really care" about Mr. Rivosecchi's use of racial slurs, but then clarified that he was offended by the comments and would not let his coworkers get the best of him. Achee Dep. 35:15–36:11. He further states that, as a result of "the repeated remarks and discrimination" he experienced while working at the Village, his mental health deteriorated and he suffered symptoms of depression. Achee Dec. ¶30.

### 4. Mr. Achee's Complaints to Supervisors

The Village has a written complaint process for its employees. Mr. Achee attended several training sessions that outlined this process, which is also set forth in the Village's Policy Against Discrimination and Harassment, which was provided to Mr. Achee. According to this process, a complainant is instructed to "contact his or her supervisor or a Harassment Committee Member listed in section 10 of this Policy, or Village Clerk, or Human Resources official," and that "if the complainant feels uncomfortable reporting the harassment to his/her supervisor, s/he should immediately report the matter to any other member of management." It is undisputed that there is no requirement that a complaint to a supervisor be made in writing. Oral Argument Tr. 6:11–22 (Sept. 15, 2023). The parties also agree that Mr. Achee did not complain to Human Resources at any point.

However, the extent to which Mr. Achee complained to his supervisors about his coworkers' comments is disputed. Mr. Achee provides several specific accounts of complaints made to his supervisors. With respect to Mr. Rivosecchi, Mr. Achee's Declaration states that Mr.

Achee complained to Mr. Torres, as well as to his crew chief Peter Savellichi,[3] that Mr. Rivosecchi had made "a racial comment towards" him on his first day, but that nothing resulted from his reporting the incident.  Achee Dec. ¶¶10–11.  Mr. Achee stated in his deposition that he told Mr. Torres that Mr. Rivosecchi "was saying a lot of racial slurs" and was making him "feel uncomfortable," and, in response, Mr. Torres told him not to mind Mr. Rivosecchi and "just shrugged it off and walked away." Achee Dep. 33:18–22.  Mr. Achee also states that he spoke with both Mr. Torres and Ms. Werbeck about the second incident with Mr. Rivosecchi and that they told him to "forget about what happened."  Achee Dec. ¶14.  According to Mr. Achee, though his supervisors "stopped putting [Mr. Achee]" with Mr. Rivosecchi after he complained, they took no disciplinary action in response.  Achee Dep. 19:3–5.

Ms. Werbeck and Mr. Torres present differing accounts of whether Mr. Achee ever complained to them about Mr. Rivosecchi.  Ms. Werbeck testified that Mr. Achee never complained to her about Mr. Rivosecchi.  Mr. Torres testified at his deposition that "[e]verybody" would complain about Mr. Rivosecchi and that "nobody wanted to work with him" because he "was a very hard worker" and "they thought he . . . made them work too much." Torres Dep. 54:11–24.  Mr. Torres also testified that Mr. Achee complained about working with Mr. Rivosecchi "several times," though he didn't testify as to what those complaints were about.  *Id*. at 57:11–58:3.  Mr. Torres could not recall whether Mr. Rivosecchi had ever been disciplined.  *Id*.

Mr. Achee also states that he complained about Frank Caracciolo.  In response to Mr. Caracciolo's repeated display of a noose on his phone and threats to hang him, Mr. Achee states that, "[i]n August of 2019, as just one example of the times I complained, I complained to Mr.

---

[3] Mr. Savellichi corroborated this account in his deposition, testifying that, in response to this incident, Mr. Achee "went to Frank [Torres] and Frank said he was going to do something about it." Savellichi Dep. 21:17–25.

Torres and Ms. Werbeck that these kinds of comments were racist, but they ignored me and nothing changed." Achee Dec. ¶24.

In total, Mr. Achee testified that he complained to Mr. Torres about racially charged remarks approximately five times over the course of his employment.   In his Declaration, Mr. Achee states that he "complained about a dozen times of race and religious discrimination to [his] supervisors."   Achee Dec. ¶32.   Mr. Achee states several times in his Declaration that he complained directly to Ms. Werbeck. *See, e.g.*, *id*. ¶¶13, 24.   However, Mr. Achee testified at his deposition that he "didn't really complain" to Ms. Werbeck, but that she was frequently present when he complained to Mr. Torres.  Achee Dep. 42:14–23.  Mr. Savellichi testified that Mr. Achee complained to him roughly a dozen times that he was not being treated as well as others by his supervisors because of his race and would frequently complain about being assigned to an area called the creek bed, which was viewed as a less desirable assignment.  However, Mr. Savellichi also testified that, to his knowledge, he did not know of any times that Mr. Achee complained about racist or antisemitic comments to his supervisors, or anyone at the Village.  Savellichi Dep. 64:2–8.

In contrast, Defendants assert that Mr. Achee did not complain to his supervisors about racial or religious discrimination at any point during his employment.  Ms. Werbeck testified that she could not recall an instance in which an employee made any complaint concerning discriminatory remarks during her employment at the Parks Department.  Though Mr. Torres testified that Mr. Achee complained to him several times about Mr. Rivosecchi, he also testified that Mr. Achee never complained to him of racial or religious discrimination.

### B.  Mr. Achee's Disciplinary Record

During his employment, Mr. Achee received verbal and written warnings for disciplinary infractions. Each warning was documented by an employee counseling form signed by one of his supervisors. Though some of these forms were prepared with the assistance of Human Resources representative Alison Walsh, Ms. Walsh testified that she did not initiate or effectuate employee discipline. Mr. Achee claims that no other employees were disciplined for the same types of offenses and that other employees were rarely disciplined at all. Mr. Savellichi testified that Ms. Werbeck would come to the job site, "checking up" on Mr. Achee and "not checking up on anyone else." *Id*. at 17:16–24. When asked at his deposition if he ever observed any white employees written up at work, Mr. Savellichi, who identifies as a white man, responded that "nobody gets written up besides me and [Mr. Achee]." *Id*. at 45:7–11. Mr. Savellichi also testified that he believed Ms. Werbeck selectively enforced rules regarding leaving early because she did not write up other employees for leaving early for lunch. *Id*. at 35:10–12. However, he also testified that Mr. Achee's early departures were especially frequent and that his coworkers would have to do more work as a result. *Id*. at 53:11–54:16.

Though Mr. Achee claims to dispute the factual bases for the following events identified in his personnel file, he offers no contradictory evidence beyond the fact that he did not sign several forms and instead wrote "Refuse to Sign" on several of them:

- Mr. Achee received an employee counseling form on July 24, 2018, for abusive time off for leaving early on eight days in 2018.

- Mr. Achee received another employee counseling form on July 30, 2018, for failing to appear for his scheduled shift for that day and for calling in late to inform his employer that he would not be present.

- Mr. Achee received an employee counseling form for failing to report to work on April 26, 2019. Mr. Achee received a letter signed by then-Deputy Village Clerk, James Hunter, informing him that he would be suspended for one day because he provided contradictory accounts about his absence and was unable to corroborate that his absence was due to a medical appointment. Mr. Hunter wrote that Mr. Achee's

statements about his absence were "marked by inconsistencies, contradictions and murky information" and that Mr. Achee was "urged to understand that continuing, unprofessional and unacceptable behavior will result in escalating discipline, up to and including termination."

- Mr. Achee received a counseling form for insubordination on April 30, 2019.  During a meeting with Ms. Werbeck, Ms. Walsh, and Mr. Achee's union representative, Jerry Bevinetto, Mr. Achee excused himself to go to the restroom and did not return to the meeting.

- Mr. Achee received another counseling form for failure to provide contact information, including his address and phone number, on July 12, 2019.

In June of 2019, Mr. Hunter became Interim Village Clerk.  At that time, he implemented a new initiative to "stop tolerating rampant and repeat performance and attendance issues from the Village's employees," and he "instructed the Village's department heads and supervisors to stop tolerating poor performance and attendance issues and to issue counseling forms to their employees who exhibit these issues." Hunter Dec. ¶7.

The parties offer conflicting accounts of the final disciplinary event before Mr. Achee's termination.  Mr. Achee states that, on August 23, 2019, he went to his crew chief Mr. Savellichi to "call out sick from work."  Achee Dec. ¶28.  Because he did not have a mobile phone, Mr. Achee asked Mr. Savellichi to call Mr. Torres and Ms. Werbeck for approval.  *Id*.  Mr. Achee also asked Mr. Savellichi for a ride to the train station.  Mr. Savellichi claims to have received authorization to do so from Ms. Werbeck.  Savellichi Dep. 18:17–25.  At his deposition, he stated that he called Ms. Werbeck and received permission, but that Ms. Werbeck then "changed the story around," claiming that she did not authorize Mr. Savellichi to take Mr. Achee to the train station.  *Id*.  Two separate written warnings, dated September 6, 2019, issued to Mr. Achee and signed by Ms. Werbeck, state that Mr. Achee left early without approval that day.  One warning states that Mr. Achee left on this date "without requesting permission to leave."  The other states that Mr. Achee "has no authority to decide to leave work for the day.  He cannot place that

responsibility to ask a supervisor for permission to leave early, on another employee as he did in this case, and has done previously." The report notes that he also left work early without approval from a supervisor on two other dates that year and that Mr. Achee's "poor attendance and regularly leaving early are disruptive and hamper productivity of other employees." Mr. Savellichi testified that he himself was also disciplined for giving Mr. Achee a ride to the train station that day.

### C. The September 6, 2019 Meeting

A counseling session was held on September 6, 2019 to discuss these incidents. Mr. Achee met with the Interim Village Clerk, Mr. Hunter who, like Mr. Achee, identifies as a black man. Ms. Werbeck, Ms. Walsh, and Mr. Achee's union representative were also present. During this meeting, the parties discussed Mr. Achee's disciplinary record, and Mr. Achee was provided an opportunity to be heard. Mr. Achee states that he told Mr. Hunter that he was given permission by his supervisors to leave early from the train station.

The parties agree that Mr. Achee complained about discrimination during this meeting but differ as to the exact details that he provided to Mr. Hunter. According to Mr. Hunter, Mr. Achee complained that at least one individual who worked in the Parks Department had used the N-word on at least one occasion. In his Declaration, Mr. Achee stated that he "explained again the discrimination against [him] and how it affected both [his] mental and physical health." Achee Dec. ¶30. When asked at his deposition whether he also complained about threats of violence towards him, Mr. Achee responded that he did, but did not provide additional details.

The parties also agree that Mr. Achee complained to Mr. Hunter about "being frequently assigned to work in a particular area of the Village, known as the creek bed" and that he also complained about the hygiene of another employee. Hunter Dec. ¶10. Mr. Hunter stated that he viewed these complaints, as well as Mr. Achee's complaints of discrimination, as "proffered

excuses" that were "manufactured as a way to avoid taking responsibility for his poor performance." *Id*. ¶12.  Mr. Hunter also observed that, during this meeting, Mr. Achee exhibited "anger, hostility and combativeness" towards Ms. Werbeck that Mr. Hunter found to be "concerning." *Id*. ¶13.  Mr. Hunter initially determined that Mr. Achee would receive an eight-day suspension for his disciplinary violations.  After negotiations with Mr. Achee's union representative, Mr. Achee was advised that he would receive a four-day suspension, with the possibility of further discipline pending review by Mr. Hunter.

### D.  Mr. Hunter's Investigation and Mr. Achee's Termination

Following the meeting, Mr. Hunter conducted a review of Mr. Achee's personnel file, as well as an investigation of Mr. Achee's allegations of racism in the Parks Department.  In his Declaration, Mr. Hunter states that, to his knowledge, "this was the first discrimination complaint ever raised by a Village employee." *Id*. ¶19.  Shortly after the September meeting, Mr. Hunter spoke with his son, James T. Hunter, a part-time laborer in the Department, who did not report experiencing discrimination.  *Id*. ¶¶20–22.  Mr. Hunter does not identify anyone else, including Mr. Achee or Mr. Savellichi, to whom he spoke as part of his investigation.[4]

Based on his "review of Mr. Achee's complete personnel file, Mr. Achee's hostility towards . . . Ms. Werbeck, and the lack of corroboration of Mr. Achee's complaint of potential racial discrimination," Mr. Hunter made the decision to terminate Mr. Achee.  *Id.* ¶24.  Mr. Hunter's Declaration acknowledges that Mr. Achee "was the first such Village employee to be held accountable for his actions pursuant" to the policy shift implemented by Mr. Hunter.  *Id.* ¶7.

---

[4] Mr. Savellichi testified that, at some point, he was called into a meeting with a Village lawyer and asked about the train incident as well as an incident involving Mr. Rivosecchi making discriminatory statements.

By letter dated September 19, 2019, Mr. Achee was informed of his termination effective that date. This letter states that, "[i]n 2019 alone, multiple incidents of unacceptable conduct have been documented. Write ups include the initiation of discipline for instances ranging from insubordination, defiance of Village and departmental rules and leaving work without authorization, among others." The letter also cites "write ups for abusive absence from work" and notes that several instances of "no call/no show are documented from 2018." The letter concludes that, because the review of Mr. Achee's personnel file "yielded proof of an escalation of troubling conduct, which has become more frequent and more flagrant," Mr. Achee's employment would be terminated.

## II.    Standard of Review

A party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the burden is met, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"— may preclude the entry of summary judgment. *Id*. An issue of fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

In determining whether to grant summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).  The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted).  Nevertheless, summary judgment is appropriately granted "if the evidence, viewed in the light most favorable to the party against whom it was entered, demonstrates that there are no genuine issues of material fact, and that the judgment is warranted as a matter of law." *Delaney*, 766 F.3d at 167 (internal citations omitted).

## III.   Discussion

### A.  Hostile Work Environment Claims under Title VII, § 1981, and the NYSHRL

Title VII provides that it shall be unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Hostile work environment claims under Title VII, § 1981, and the NYSHRL are assessed under the same standard. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 262 (2d Cir. 2023).  To survive summary judgment on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  As a general rule, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374

(2d Cir. 2002).  While isolated incidents of harassment ordinarily do not rise to this level, the Second Circuit has recognized that "a single act can create a hostile work environment if it in fact 'works a transformation of the plaintiff's workplace.'"  *Banks*, 81 F.4th at 262 (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)).  The test also has both objective and subjective elements, the ultimate question being whether "a reasonable person would have found [the work environment] to be [hostile], and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004).

Whether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances, including "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance."  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir. 1999) (citing *Harris*, 510 U.S. at 23).  Conduct that fails to meet the objective component of the test "is beyond Title VII's purview." *Harris*, 510 U.S. at 21.  A plaintiff must also show that there is a basis for imputing the conduct that created the hostile environment to the employer.  *Serrano v. New York State Dep't of Env't Conservation*, 714 F. App'x 90, 91 (2d Cir. 2018).  When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

Based upon the record before me, Mr. Achee has set forth sufficient evidence of racial and religious harassment such that a reasonable jury could find that the conditions of his employment were altered and that the incidents he proffers created an abusive working environment.  The Second Circuit's recent analysis in *Banks* is particularly instructive.  In *Banks*, the plaintiff, who

identifies as an African American woman, experienced various forms of discrimination by her coworkers, including racial slurs and repeated displays of racist symbols in her workplace. In particular, the Court focused on plaintiff's coworkers' display of nooses near the workstations of black employees in her workplace. Citing the history of the noose as a symbol of racial violence, the Second Circuit concluded that, "[a] reasonable jury could find that even a single placement of this object -- imbued as it is with historical gravity as a symbol and tool of actual violence -- directly at the workstation of a Black employee could amount to severe conduct sufficient to support an inference that the workplace is hostile to Black employees." *Banks*, 81 F.4th at 265. The Court also recognized that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n****r.'" *Id*. at 266 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)).

Mr. Achee has therefore clearly met the objective standard for a hostile work environment. Defendants' argument that the racist statements made to Mr. Achee were not sufficiently frequent is unavailing and ignores the increasing severity of the comments, which escalated into threats of physical violence couched in racial terms. Under *Banks*, Mr. Caracciolo's statement that his white coworkers would assist in hanging Mr. Achee, combined with his showing Mr. Achee an image of a noose is, on its own, sufficiently severe to cause a reasonable person to consider the Valley Stream Parks Department a hostile work environment.

Mr. Achee has also met the subjective standard. Defendants' argument that Mr. Achee was not "offended" by his coworkers' statements is not persuasive and mischaracterizes his testimony. Though Plaintiff stated that he tried not to let these statements bother him, Plaintiff testified that he nevertheless was offended by the racial slurs and that these threats caused mental anguish and

symptoms of depression.  Achee Dep. 168:15–169:24.  Defendants point to Mr. Achee's letters from 2014 stating that he enjoyed working in the Department as evidence to the contrary.  But these letters pre-date the most serious incidents by several years and do not eliminate the factual issue that Mr. Achee's testimony raises.

Having established that a jury could find that his coworkers' behavior created an objectively and subjectively hostile work environment, Plaintiff must establish a basis for imputing this conduct to his employer.  Plaintiff states that he complained to his supervisors on multiple occasions, but that they ignored him.  Specifically, Plaintiff states that, after Mr. Caracciolo showed him a noose on his phone and threatened to hang him, he "complained to Mr. Torres and Ms. Werbeck that these kinds of comments were racist, but they ignored me and nothing changed." Achee Dec. ¶24.  Defendants deny that Plaintiff ever complained to his supervisors and argue that these are "baseless assertions." Reply at 10.  But resolving these two accounts presents factual questions for a jury.  Viewing the record in the light most favorable to the non-moving party, as I am required to do at this stage, such allegations are sufficient to impute the objectionable conduct to Defendants. *Feingold*, 366 F.3d at 152.  Defendants' motion with respect to Plaintiff's hostile work environment claims is therefore denied.

### B.  Discrimination Claims under Title VII, §1981, and the NYSHRL

Defendants move for summary judgment on Plaintiff's racial discrimination claims, arguing that he has not established a prima facie case of discrimination and that, even if he had, he has not demonstrated that Defendants' non-discriminatory reasons for his termination are pretexts for discrimination.

The parties agree on the relevant framework for evaluating these claims and that discrimination claims under Title VII, §1981, and the NYSHRL are analyzed under the long-

established *McDonnell–Douglas* burden-shifting framework.  "The plaintiff in such a case . . . must first establish, by a preponderance of the evidence, a 'prima facie' case of racial discrimination . . . [E]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  At that point, the defendant faces the "burden of producing an explanation to rebut the prima facie case—i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *St. Mary's Honor Ctr.*, 509 U.S. at 506–07 (internal citations omitted).  If the defendant does so, then the plaintiff must establish "that the proffered reason was not the true reason for the employment decision, *and* that [a discriminatory motive] was"—that is, not merely that the defendant's alleged motive is a pretext, but that it is a pretext for discrimination.  *Id*. at 508 (emphasis added) (internal citations omitted); *see also Reeves*, 530 U.S. at 146–49.  At all times, the ultimate burden of proof rests with the plaintiff.

The requirements for making out a plaintiff's prima facie case under the *McDonnell–Douglas* framework are "de minimis." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).  A plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).  The parties agree that Mr. Achee has met the first three elements but disagree as to whether he has shown that his termination occurred in circumstances giving rise to an inference of discrimination.

    **1.  Whether Plaintiff Has Established a Prima Facie Case of Racial and Religious Discrimination**

The standard for proving an inference of discrimination is a "flexible one that can be satisfied differently in differing factual scenarios." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). "No one particular type of proof is required." *Moore v. Kingsbrook Jewish Med. Ctr.*, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu– Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (internal citations omitted). However, a plaintiff's "mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim." *Moore*, 2013 WL 3968748, at *6.

Plaintiff argues that discrimination can be inferred from two circumstances. First, he asserts that, when he reported discriminatory comments to his supervisors, they told him to forget about them, and they took no disciplinary action in response. Second, Plaintiff asserts that he was selectively disciplined for conduct for which his non-black and non-Jewish coworkers were not.

### i.  Discriminatory Comments

Plaintiff argues that his supervisors' failure to address his complaints of racial and religious discrimination evidences their animus. Plaintiff states that he complained about a dozen times of racial and religious discrimination to his supervisors and that they took no action in response. Achee Dec. ¶32. Defendants respond that the comments Mr. Achee reported are mere "stray remarks" and that, because they were made by non-decisionmakers, they have little tendency to show discriminatory sentiment on behalf of Mr. Achee's employer. However, as the Second Circuit recognized in *Banks*, the stray remarks doctrine is by no means dispositive in employment

discrimination cases, and it is incorrect to "first categorize[] comments as stray or not stray and then disregard [them] if they fall into the stray category." *Banks*, 81 F.4th at 266 (citing *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115–16 (2d Cir. 2007)).   Where "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Abdu-Brisson*, 239 F.3d at 468; *see Smith v. K & F Indus.*, 190 F. Supp. 2d 643, 651 (S.D.N.Y. 2002) (Where "offensive remarks are combined with other evidence of discriminatory intent, courts are reluctant to grant summary judgment.").   The offensive remarks in this case, when repeatedly brought to the attention of Mr. Achee's supervisors who took no action in response and instructed him to "forget about" them, easily meet the de minimis requirements for a prima facie case.

### ii.  Disparate Treatment

Plaintiff also argues that his differential treatment in being disciplined supports an inference of discrimination.   To raise such an inference, "[t]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, such that the comparator must be similarly situated to the plaintiff in all material respects." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 21 (2d Cir. 2013) (internal citations omitted).   "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Id.*; *see Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

Mr. Achee has raised a triable issue of fact as to whether his employer discriminated against him through its selective enforcement of discipline.   Mr. Achee asserts that "Defendants did not discipline White and non-Jewish Laborers for the reasons they disciplined Plaintiff."   Opp. at 20. Defendants respond that Mr. Achee has not "put forth *any* evidence of how any other Village

employees were treated regarding disciplinary actions or termination." Reply at 3.  However, Mr. Achee's claim is supported by Mr. Hunter's own acknowledgement that no other employee had previously been terminated for the reasons Defendants state that they terminated Mr. Achee, despite the presence of "rampant and repeat performance and attendance issues from the Village's employees." Hunter Dec. ¶7.  Mr. Achee's crew chief, Mr. Savellichi, also testified that Defendants rarely disciplined non-black employees for attendance and performance issues for which Mr. Achee had been disciplined.  Savellichi Dep. 34:21–35:12.  Together, this testimony satisfies Plaintiff's de minimis burden of establishing a prima facie inference of discrimination.

### iii. Attribution of Discriminatory Inferences to Mr. Achee's Employer

In order to succeed on his discrimination claims, Mr. Achee must demonstrate that these inferences can be attributed to his employer.  It is undisputed that Mr. Hunter did not harbor racial or religious animus against Plaintiff.  However, a Title VII plaintiff can succeed on a discrimination claim against an employer "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [decision-making] process." *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008).  Where an employer relies on the account of a biased supervisor in reaching an adverse employment decision, that supervisor has played a meaningful role in the decision-making process. *See Penta v. Sears Roebuck, Co.*, 2003 WL 21143071, at *6 (E.D.N.Y. May 12, 2003).

Mr. Achee has made this showing.  It is undisputed that one of the three grounds upon which Mr. Hunter relied was Mr. Achee's personnel record which a jury could find was tainted by the racial animus of Mr. Achee's supervisors.  Mr. Hunter did not speak with any other employees to corroborate these accounts, except for his son, who began working for the Department years

after many of the relevant events in this case and who had no firsthand knowledge of employee personnel issues.[5]

The other two grounds proffered by Mr. Hunter, his investigation of racism in the Department, and his observation of Mr. Achee's demeanor towards Ms. Werbeck at the September 2019 meeting, do not overcome Mr. Achee's showing that his supervisors' accounts played a meaningful role in his termination.  Even accepting that Mr. Achee's termination may have had an additional cause, Mr. Achee is required to demonstrate only that the forbidden animus "was a motivating factor" in his termination.  *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992).

Because Mr. Achee has raised issues of fact that his supervisors harbored discriminatory animus and that Mr. Hunter effectuated that animus in relying on their reports in deciding to terminate Mr. Achee's employment, Plaintiff has met his initial burden of establishing a prima facie case.

### 2.  Whether Defendants Have Articulated a Legitimate, Non-Discriminatory Reason for the Employment Action

Defendants have articulated legitimate, non-discriminatory reasons for their decision to terminate Plaintiff.  Mr. Achee had a well-documented disciplinary history, including infractions related to timeliness, insubordination, and absenteeism.  These are legitimate and non-discriminatory reasons to terminate an employee.  *See, e.g.*, *Lindsay v. Harris*, 50 F. App'x 61, 62 (2d Cir. 2002) ("[P]oor work performance, tardiness and insubordination . . . are legitimate non-discriminatory reasons" for discharge).

### 3.  Whether Defendants' Stated Reasons are Pretextual

_____

[5] The quality of Mr. Hunter's investigation into the culture of the Department will be addressed below.

Once a defendant has proffered a non-discriminatory reason for an adverse employment action, the burden shifts back to the plaintiff to show that this reason is pretextual. *Holcomb*, 521 F.3d at 141.  To avoid summary judgment, the plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial discrimination played a role in the adverse action taken by the defendant. *Id*.; *Weber v. City of New York*, 973 F. Supp. 2d 227, 255–57 (E.D.N.Y. 2013). With respect to the plaintiff's ultimate burden, the Supreme Court has mandated that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original).  The Court of Appeals for the Second Circuit counsels that "(w)hat this [holding of *St. Mary's*] means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging h[im] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original).  A plaintiff who establishes both a prima facie discrimination case and pretext must still, in order to survive summary judgment, demonstrate that he can meet his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against h[im]." *Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 143).  Thus, even when a plaintiff can establish pretext, summary judgment is still appropriate if there is insufficient evidence in the record as a whole to support a finding that the plaintiff was discharged because of religion, race or national origin discrimination.  *Robinson v. Macy's Retail Holding, Inc*., 2015 WL 10793114, at *10 (S.D.N.Y. Aug. 19, 2015).

Inconsistencies in connection with the write ups Mr. Achee received for leaving early on August 23, 2019 present evidence of pretext. *See Graziadio v. Culinary Inst. Of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (Plaintiff can meet his burden "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" reasons for its action.). As Mr. Achee asserts, that he was issued two written warnings for leaving work early on this date deviates from the usual disciplinary process, under which an employee receives one warning for one incident. Defendants offer no sound explanation as to why Plaintiff was issued two warnings for the same conduct.[6] Even more importantly, there is an issue of fact as to whether his supervisors had in fact approved his leaving work early on this date.

Mr. Achee's disparate disciplinary treatment also presents evidence of pretext. Mr. Hunter admitted that Plaintiff was the only employee who was terminated for these issues despite similar widespread and repeat performance issues in the Department. A jury could infer from this that the reasons given for his termination were pretextual. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) (inconsistent application of company disciplinary policy sufficient for jury to find that employer's defense was pretext for discrimination).

Because a reasonable jury could find not only that the grounds proffered were pretextual, but also that the Defendants discriminated against Plaintiff by ignoring his complaints of racial and religious discrimination and by disciplining him selectively, Defendants' motion is denied on Mr. Achee's discrimination claims.

### C. Retaliation Claims under Title VII, §1981, and the NYSHRL

---

[6] Indeed, the two write ups that Mr. Achee received on this day appear to conflict with each other. One write up says that Mr. Achee left work early "without requesting permission to leave." The other acknowledges that Mr. Achee did seek approval, but states that he "cannot place that responsibility to ask a supervisor for permission to leave early, on another employee, as he did in this case."

In addition to prohibiting certain forms of discrimination, Title VII also prohibits retaliation by employers against workers for their opposition to employment discrimination. Title VII, §1981, and NYSHRL retaliation claims are analyzed under the same *McDonnell–Douglas* framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). To establish a prima facie case of retaliation, a plaintiff must demonstrate that he participated in a protected activity, that he suffered an adverse employment action, and that there was a causal connection between his engaging in the protected activity and the adverse employment action. *Banks*, 81 F.4th at 275. Proof of causation can be shown either (1) directly, through evidence of retaliatory animus directed against a plaintiff by the defendant, or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct. *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015). In making out the causal connection, a plaintiff must show that the desire to retaliate was not just a motivating factor, but was a "but-for" cause of the challenged employment action. *University of Texas Southwestern Medical v. Nassar*, 570 U.S. 338, 352 (2013). As the Supreme Court recently made clear, this can be a "sweeping standard," and often there can be more than one "but-for" cause of an adverse employment action. *Banks*, 81 F.4th 275 (citing *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020)).

### 1.  Whether Plaintiff Has Established a Prima Facie Case of Retaliation

At a minimum, the record establishes Mr. Achee has made a prima facie case of retaliation based on his complaints to Mr. Hunter in September of 2019.[7] "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the

---

[7] Because Plaintiff has made a prima facie case of retaliation with respect to Mr. Hunter himself, I do not rely on Plaintiff's "cat's paw" theory. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274 (2d Cir. 2016).

protected activity was closely followed in time by the adverse employment action." *Banks*, 81 F.4th at 277 (quoting *Gorzynski*, 596 F.3d at 110).  A period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action.  *Id*.  Mr. Achee complained to Mr. Hunter for the first time that one of his coworkers used the N-word to describe him during their meeting on September 6, 2019.  On September 19, Mr. Hunter made the decision to fire Mr. Achee.  Such a short time frame is sufficient to give rise to an inference of retaliation at the prima facie stage.

Defendants' response that Mr. Achee "purposefully and strategically raised his complaint for the first time at his disciplinary meeting in an attempt to distract the Village" from his performance and attendance issues, Reply at 7–8, requires an assessment of Mr. Achee's credibility.  Such determinations are appropriate for a jury, and are not for me to make at the summary judgment stage.  Furthermore, as previously discussed, that Mr. Hunter terminated Mr. Achee and no other employees for similar conduct provides additional evidence that Mr. Achee's termination was the product of retaliation.  *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 209 (E.D.N.Y. 2009) (prima facie case of retaliation can be shown by "circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.").  Based on the short time period between Mr. Achee's complaint of racial discrimination, as well as evidence of his disparate treatment, Mr. Achee has established a prima facie case of retaliation.

### 2.  Whether Defendants Have Articulated a Legitimate Reason for the Employment Action

As discussed above, Defendants have met their burden of demonstrating legitimate bases for Plaintiff's termination.

### 3.  Whether Defendants' Stated Reasons are Pretextual

As with Mr. Achee's discrimination claims, the record presents evidence that the reasons given by Mr. Hunter were pretextual and that retaliation was the real reason for his termination. Mr. Hunter initially decided to suspend Plaintiff based on his attendance and performance issues and his demeanor towards Ms. Werbeck during the meeting on September 6th, 2019.  In his Declaration, Mr. Hunter states that, after he conducted his investigation into the culture of the Department, he concluded that Mr. Achee should be terminated for cause based on "the lack of corroboration of Mr. Achee's complaint of potential racial discrimination," as well as Mr. Achee's "complete personnel file" and demeanor toward Ms. Werbeck.  Hunter Dec. ¶24.

Insofar as Mr. Hunter relied on the results of his investigation into racial discrimination in the Department, a jury could find that Mr. Hunter's investigation was not rigorous enough to support his conclusion.  As previously described, Mr. Hunter spoke only with his son, who did not claim any firsthand knowledge of the events described by Mr. Achee.  Mr. Hunter did not speak with Mr. Achee's crew chief, with Mr. Achee himself, or with any other employees. Such weakness in Mr. Hunter's explanation for Mr. Achee's termination supports a finding of pretext. *Graziadio*, 817 F.3d at 430.  Even more significantly, the "lack of corroboration" of Mr. Achee's complaint of discrimination is described by Mr. Hunter as itself a cause of Mr. Hunter's decision to terminate Mr. Achee.  Hunter Dec. ¶24.  Based on this record, a reasonable jury could conclude that Mr. Hunter's stated reasons were pretextual and that Mr. Achee's complaint was a but-for cause of his termination.

Defendants point to Mr. Hunter's first-hand experience witnessing Mr. Achee's hostility toward Ms. Werbeck and Mr. Hunter's review of his disciplinary record as other factors.  But the two other factors only caused Mr. Hunter to initially suspend Mr. Achee.  Only after Mr. Hunter completed his inadequate investigation into Mr. Achee's complaint of racial discrimination did he

make the decision to terminate Mr. Achee.  Furthermore, as previously described, the performance and attendance issues cited by Mr. Hunter were rampant throughout the Parks Department, but Mr. Achee was the only individual who was terminated.  Based on weaknesses in Mr. Hunter's explanation, combined with Mr. Achee's disparate treatment and the close temporal proximity between his complaint and his termination, a rational jury could find that retaliation was the but-for cause of the actions taken against him.  Accordingly, Defendants' summary judgment motion is denied with respect to Plaintiff's retaliation claims.

### D.  Aiding and Abetting Liability Under the NYSHRL

Plaintiff claims that the named individual Defendants should be held liable in their individual capacities under the NYSHRL, which provides that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6).  A defendant may be held personally liable under the NYSHRL if he or she "actually participates in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995).  "[T]he case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under NYSHRL § 296(6)."  *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999).

Plaintiff has raised questions of fact as to whether his supervisors Ms. Werbeck and Mr. Torres participated in discriminatory conduct by ignoring his complaints and telling him to forget about the racist comments of his coworkers.  Defendants argue that Mr. Achee cannot bring claims against the individual Defendants because his underlying claims against the Village fail.  But Mr. Achee has raised issues of fact sufficient to deny the Village's motion on his NYSHRL claims.  Defendants further argue that Plaintiff cannot establish any conduct that equates to aiding and

abetting because he "has failed to show that he complained to Mr. Torres or Ms. Werbeck." Reply at 10. However, as described earlier, Mr. Achee, through his sworn testimony, combined with the testimony of his crew chief, has raised a triable issue of fact that he did complain to both supervisors about discriminatory remarks and threats made against him. Summary judgment with respect to Mr. Achee's individual claims against Mr. Torres and Ms. Werbeck is therefore denied.

**Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is denied in its entirety. The parties are directed to prepare a pre-trial order under the supervision of Magistrate Judge Lee G. Dunst.

**SO ORDERED.**

_____
      **/S/**
**NINA GERSHON**
**United States District Judge**

October 30, 2023
Brooklyn, New York